STATE of Delaware, Plaintiff,

v.

Ransford H. BRYAN, Defendant.

Superior Court of Delaware, Sussex County.

Submitted: June 20, 1988.
Decided: June 27, 1988.

William B. George, Jr., and Lillian M. Moore, Dept. of Justice, Wilmington, for plaintiff.

John M. Sandy, Thomas J. Stumpf and Associates, Georgetown, and Jack B. Rubin, Baltimore, for defendant.

## OPINION

CHANDLER, Judge.

Defendant Ransford H. Bryan, III is charged with murder in the first degree, possession of a deadly weapon during the commission of a felony and theft by false pretenses. These charges stem from the disappearance of Douglas Brockway on October 15, 1987 and the discovery of his decomposed body on November 6, 1987 in Sussex County, Delaware. The defendant has moved to suppress statements made by him to the police on the grounds that the statements were obtained in violation of his rights under the Fourth, Fifth and Sixth Amendments to the United States Constitution and under Sections Six and Seven of Article One of the Delaware Constitution. Having reviewed the testimony at the suppression hearing, the attorneys' memoranda of law and the applicable case law, I have decided to deny defendant's motion to suppress.

Defendant presented four arguments in support of his motion. First, he argued that the police lacked probable cause to arrest him for murder on November 6, 1987. The arrest was made without a warrant and defendant has accordingly argued that all evidence gained as a result of his illegal arrest should be suppressed. Second, defendant contended that he had invoked his Fifth Amendment right to remain silent and to have the assistance of counsel several times prior to being taken into custody. Therefore, the rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), applied and defendant's waiver of his *Miranda* rights during the subsequent custodial interrogation initiated by the police was invalid. Third, the defendant argued that the actions of the police were so egregious as to deny him the fundamental fairness guaranteed by the Due Process Clause of the Fifth Amendment and rendered any statement by him involuntary. Included in this argument was defendant's contention that the failure of the police to inform him that his attorney had called the station while defendant was in custody rendered his waiver and subsequent statement involuntary. Finally, the defendant argued that because the theft charge and murder charge were interrelated, his Sixth Amendment right to counsel had attached as to both charges prior to Nov. 6, 1987, the date of his arrest for murder, so that his later incriminating statement made in the absence of his attorney was a violation of this right.

The following testimony was elicited during the suppression hearing. Detective Warrington ("Warrington") of the Delaware State Police testified that he became involved in the investigation of the disappearance of the victim on Oct. 19, 1987. The victim had been reported as missing by his father on Oct. 16. On Monday, the 19th, Warrington interviewed the victim's mother and father and the defendant at the victim's residence where he had lived with his mother and the defendant. At the time of his disappearance, the victim and the defendant were 18 years old and recent high school graduates. The victim's mother had last seen the victim on Oct. 15 at approximately 6:15 p.m. She told Warrington that on Oct. 13, her son had stated that he felt someone was taking money from his checking account by use of his "Money–Access Card" ("MAC"). She had advised him to report this to his bank. On Oct. 14, the victim went to the Sussex Trust Company, filed a theft report and signed an affidavit alleging that someone was taking money from his account. Warrington confirmed this with the bank's security officer and ascertained that from Sept. 25 to Oct. 12 or 13, on five different occasions, a total of $1,110.00 was alleged to have been taken.

The mother also told Warrington that after the victim had returned from reporting the theft at the bank, the victim had held the defendant against the wall and threatened him, saying "If I find out that you are— that you did this, it is going to be between you and me."

During the interview on the 19th, defendant told Warrington and the victim's parents that the victim had a drug habit, that he owed a drug dealer $2000.00 and that he wanted to get money to pay off the debt in such a way as not to alert his mother to the fact. The defendant told them that the victim had enlisted the defendant to make the withdrawals from the MAC window so that the victim would not be seen. The victim then intended to go to the bank and complain about the theft, get reimbursed and still have money to pay his drug debt. The defendant said that he had withdrawn $900.00 from the victim's account and had given the victim $300.00 of his own money for a total of $1200 to satisfy part of the debt.

The defendant then told Warrington that he and the victim had told the victim's mother they were going squirrel hunting, but instead had driven to Peddler's Village Shopping Center via County Route 277. There they had seen a Mexican sitting in a car. The victim had gotten out with his $1200.00 and had walked over toward the Mexican. The victim came back a few minutes later to tell the defendant that he was going riding with the Mexican drug dealer and to tell his mother that he, the victim, would be home later or that he would be staying with his cousin. The defendant said that he saw the victim get into the car with the Mexican. The car, described by the defendant as a four-door, red Pontiac 6000, then headed eastward on Route 24. The defendant followed the car for a short time, then turned back home. According to the defendant, that was the last time he saw the victim.

When the defendant returned home at approximately 7:00 p.m., he immediately told the victim's mother this story about the Mexican drug dealer, the drug debt and how he had taken money from the bank.

The victim's mother confirmed this during the interview with Warrington on the 19th, but then prompted the defendant by saying "Randy, don't you think you ought to tell the detective about the gun?" The defendant then told Warrington that he had placed the victim's twenty-gauge shotgun out the bedroom window so that the mother would not see them leaving with a gun to go squirrel hunting. The mother, however, contradicted this story and told Warrington that she had seen her son leave through the front door carrying the defendant's twenty-gauge shotgun and a handful of shells. She told Warrington that although both young men had twenty-gauge shotguns, the stock on the defendant's gun was of a lighter wood than the victim's. The defendant denied seeing the victim with a gun. The mother related to the detective that after the defendant had returned home on the 15th, she had asked him where the gun was and he had showed her the gun in his car, the same gun the victim had left with. This gun later disappeared. The mother told Warrington that on Saturday, Oct. 17, she and her daughter searched the defendant's car and found nothing except a wallet in the glove box that contained $300.00 in new twenty-dollar bills. They believed the wallet to belong to the defendant. When the victim's sister confronted the defendant with the money on the 17th, the defendant became very upset and stated that he had no idea how the money got there. The mother kept the money and later gave it to Warrington who showed the bills to Jerry Hagan, the bank's security officer. Hagan told Warrington that the bills were marked with a black magic marker consistent with the way Sussex Trust marks its money to put in the MAC machine.

Warrington interviewed the defendant and the victim's family again on Oct. 20. He questioned the defendant about various inconsistencies in his story and asked defendant to tell him if he knew where the victim was or had any more information. The defendant told Warrington that he had told the detective everything and had nothing more to offer.

Warrington thereafter focused on the drug dealer and the drug background of the victim. He questioned friends of the victim, but could find no evidence to substantiate the defendant's story that the victim had been dealing drugs and had used cocaine. One person came forward and stated that she had seen someone similar to the victim's description getting into a car around 7:00 p.m. on Oct. 15, at Peddler's Village. However, she described the car as a Mustang, Cougar or Camaro and said it had headed west on Rt. 24. The detective followed up leads, questioned a Mexican who lived in the area, and staked out Peddler's Village one evening based on a tip that the victim might show up there. Meanwhile, Warrington received photographs from Sussex Trust showing the defendant making withdrawals on four occasions. The last withdrawal was on Oct. 12 or 13 for $300.00.

On Nov. 6, 1987 two deer hunters found a body in a wooded area off Route 277. Warrington and Detective Griffith responded to the scene and saw a badly decomposed body with the remnants of a green and white Newport t-shirt. There were some holes in the upper torso cavity consistent with gunshot wounds. Warrington recognized the t-shirt from a description of the victim's clothing given to him on the 19th. The torso also was of a substantial size, similar to the victim's.

Warrington and Griffith then went to defendant's father's residence, told him that the victim's body had been found and that they were going to arrest the defendant. They asked the father to come with them. The three men drove to where the defendant was working on a construction site, defendant's father retrieved his son from the job site and they placed the defendant in the back of the police car. Griffith told the defendant he was under arrest for murder in the first degree and not to make any statement until they got back to Troop 7. At Troop 7, defendant's father asked if he could talk with his son. Warrington agreed and led them to an interview room. Approximately a half hour later, the defendant's father came out and told Warrington: "He says he didn't do it."

Warrington and Griffith then went inside to interview the defendant. Warrington read defendant the *Miranda* warnings from a card and asked if defendant understood his rights. The defendant said he did. The defendant did not ask to have an attorney present. The interview proceeded and defendant later stated to the police that the shooting was accidental.

The first issue is whether the police had probable cause for a warrantless arrest. Under 11 *Del.C.* § 1904(b)(1), the authority of law enforcement officers to make felony arrests without a warrant is limited to offenses committed in their presence or to instances where they have "reasonable ground to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." The Delaware Supreme Court has recently interpreted the phrase "reasonable ground to believe" in this statute to be the legal equivalent of "probable cause." *See Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988).

The defense argues that Warrington lacked probable cause to arrest defendant for murder on Nov. 6 because: a) the body was so badly decomposed that no actual identification could be made at that time and the green and white t-shirt was not mentioned in the missing person report or flyer distributed by the family; b) defendant's story to the detective on Oct. 19, voluntarily implicating himself in the theft from Sussex Trust, removed the theft as motive for the murder; c) the State's assumption that the victim was killed during the squirrel hunting trip between 6:15 and 7:00 p.m. on Oct. 15 is not based on any medical testimony and is further precluded by the witness who told Warrington that she had seen someone matching the victim's description getting into a car at Peddler's Village around 7:00 p.m. on Oct. 15; and d) it was reasonable for defendant, who had just seen his friend drive off with a drug dealer with $800.00 less than the friend owed on his drug debt, to tell his friend's mother of his concern.

■ The State, however, argues that on Nov. 6, Warrington had trustworthy knowledge of facts and circumstances that would lead a reasonably prudent man to believe that defendant murdered the victim. I agree.

The defense points to facts such as the lack of a precise identification of the body and a witness's report of seeing someone like the victim around 7:00 p.m. on Oct. 15 as somehow precluding a reasonably cautious person from concluding he had probable cause to make an arrest. However, this argument essentially equates probable cause with certainty of guilt. The requirement is not so severe. Probable cause "is an elusive concept which avoids precise definition." *State v. Cochran*, Del.Supr., 372 A.2d 193, 195 (1977). It lies " 'somewhere between suspicion and sufficient evidence to convict.' " *Id.* (quoting *United States v. Thompson*, D.Del., 292 F.Supp. 757, 761 (1968)). And it is measured by the totality of the circumstances on a case-by-case basis. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed. 2d 1453 (1983). A review of the facts of this particular case leads me to conclude that Warrington had probable cause to arrest the defendant for murder on Nov. 6, 1987.

As cited by the State in its argument, the facts known to the police as a result of their initial interview of the defendant and the victim's family demonstrated sufficient inconsistencies in the defendant's version of the events on Oct. 15 to focus suspicion on the defendant. The victim had previously confronted the defendant about the defendant's possible involvement in the theft of money from his bank account. The victim was last seen leaving with the defendant to go squirrel hunting, carrying defendant's shotgun. The defendant denied this latter fact, contending instead that they had passed the victim's shotgun out the window. However, defendant's shotgun was never located, having last been seen when defendant returned to tell the victim's mother the story of the Mexican drug dealer. This revelation, immediately upon defendant's return before the victim's absence would have been noted by his mother, was not consistent with the defendant's story of the elaborate plan to conceal the debt from the mother.

The continuing police investigation turned up facts which transformed their early suspicion into information that would lead a man of reasonable caution to conclude that there was probable cause to arrest the defendant for murder. There were photographs of defendant withdrawing money from the victim's bank account using the victim's MAC card. The victim's mother and sister had discovered $300.00 in the defendant's car that was identified by a bank security officer as marked for use in a MAC machine. The victim was not known by his friends to have consumed cocaine or to have dealt in drugs, thus undermining defendant's story about a drug debt and Mexican drug dealer. None of the tips about a Mexican drug dealer or the whereabouts of the victim were substantiated. Finally, on Nov. 6, the police saw a body, of the approximate size of the victim, wearing a t-shirt described to the police by the victim's family during the Oct. 19 interview and displaying gunshot wounds. Thus, the defendant's statement to the police on Nov. 6 was incident to his legal warrantless felony arrest. Defendant's motion to suppress for lack of probable cause is therefore denied.

■ The second issue is whether the police-initiated custodial interrogation of the defendant on Nov. 6 rendered invalid his waiver of his Fifth Amendment rights, pursuant to the rule in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh'g denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). To understand defendant's argument, it is necessary to relate the events that took place during the investigation.

Following the second interview of defendant and the victim's family on Oct. 20, 1987, Warrington arranged to have the defendant take a polygraph examination. On Oct. 21, Jack Rubin, a Baltimore attorney, called Warrington and, in the presence of the defendant and his mother who were

seated in his office, told Warrington that there would be no polygraph and advised him not to interrogate the defendant unless he had a warrant for his arrest. Warrington then informed the attorney that he had a warrant for defendant's arrest for theft. Rubin arranged with Warrington for the defendant to turn himself in the next day, but advised him again not to question the defendant and to deal only through him, the defendant's attorney. At the suppression hearing, Rubin testified that during this office consultation on Oct. 21, he had discussed defendant's rights with the defendant in great detail, in particular, his right to remain silent and to deal with the police through his attorney.

The next day, Oct. 22, defendant turned himself in at Troop 4 on the theft warrant. He was accompanied by local counsel. He was arraigned at Justice of the Peace Court 3 and a preliminary hearing was scheduled for Oct. 29, 1987. On Oct. 27, Rubin spoke with Warrington who had called to see if Rubin could help him obtain information as to the whereabouts of the missing person. On Oct. 28, Rubin met with Warrington at Troop 7. He again informed Warrington, on behalf of his client, that the police were not to interrogate or question the defendant and that any contact with the defendant was to be through his attorney. On Oct. 29, the defendant waived his right to a preliminary hearing. After the session in the courtroom, Rubin again spoke with Warrington. The defendant and his mother were present. Rubin advised Warrington that the defendant was asserting his right to remain silent and his right to be left alone, unless the police came through his attorney. Rubin informed the detective that he thought the larceny charge was frivolous and was only being done to pressure the defendant into giving a statement.

On Nov. 6, 1987, after the body of the victim was discovered, the police arrested the defendant for murder and took him into custody. While the defendant's father was talking with the defendant at Troop 7, Warrington called the defendant's mother and informed her that her son had been arrested for murder. Some time later, Rubin telephoned the barracks and spoke with Warrington. There was a dispute during the hearing as to the exact timing of this phone call. Warrington testified that Rubin called while the defendant's father was still talking with his son, before the police interrogated the defendant. Warrington recalled that he had informed Rubin of the situation and that Rubin had said, "You know not to talk to him." Rubin testified that he had said there should be no interrogation, but had been told by Warrington that it was too late, that the defendant had already admitted it was an accident. For the sake of the discussion that follows, I will assume that the detective's version of the timing of the phone call is correct.

Defendant argues that on several occasions prior to being taken into custody on Nov. 6, 1987, he invoked, through his attorney, his right to remain silent and his right to counsel. According to the defendant, the application of the bright-line, prophylactic rule of *Edwards* renders invalid his waiver of his Fifth Amendment rights during his Nov. 6 custodial interrogation. The defendant thus is asking this Court to extend the *Edwards* rule to the first and only custodial interrogation of the defendant based on the assertion by his attorney of defendant's *Miranda* rights prior to the defendant being taken into custody. I decline to do so.

At no time during his interrogation did the defendant assert to the police that he wished to remain silent or to have an attorney present. However, now the defendant wants the Court to hold his waiver of his *Miranda* rights invalid based upon his attorney's prior invocation of the defendant's rights. This agency theory disregards the established proposition that the privilege against compulsory self-incrimination is a personal one that can only be invoked by the individual whose testimony is being compelled. *Cf. Moran v. Burbine,* 475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 1147–1148 n. 4, 89 L.Ed.2d 410 (1986). Even more troubling is the attempted application of the *Edwards* rule to the facts of this case.

In *Edwards*, the United States Supreme Court held that "when an accused invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."[1] 451 U.S. at 484, 101 S.Ct. at 1884. The Court further held that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–485, 101 S.Ct. at 1885. The facts of that case are important. Edwards, in custody pursuant to an arrest warrant for robbery, burglary and first-degree murder and having been informed of his rights as required by *Miranda*, was being interrogated by the police when he said: "I want an attorney before making a deal." At this point, questioning ceased and he was taken to jail. The next day, two other detectives requested to talk with Edwards who, after being informed of his rights a second time, eventually implicated himself in the crime. It was this second custodial interrogation of Edwards which the Court condemned as violating his " 'undisputed right' under *Miranda* to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' " *Id.* at 485, 101 S.Ct. at 1885 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980). Thus, under *Edwards*, it is only after a defendant has asserted his Fifth Amendment right to counsel in a *custodial* setting that his subsequent waiver during a second police-intitiated interrogation becomes automatically invalid.

The Court in *Edwards* traced defendant's right to be free of interrogation from the following language in *Miranda v. Arizona*, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627–1628, 16 L.Ed.2d 694, *reh'g denied*, *California v. Stewart*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966).

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on an individual to overcome free choice in producing a statement after the privilege has been invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Id.* at 473–474, 86 S.Ct. at 1627–1628.

The warnings and subsequent procedures outlined by the *Miranda* Court were devised to safeguard the individual's privi-

---

1. *Edwards* only governs the Fifth Amendment right to counsel and not the right to remain silent. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court held that incriminating statements obtained after a person in custody had decided to remain silent were admissible where his right to cut off questioning was scrupulously honored. In that case, the police advised the defendant of his *Miranda* rights, interrogated him concerning a robbery, ceased the interrogation immediately upon his request, but resumed questioning after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been the subject of the earlier interrogation. *Id.* at 106, 96 S.Ct. at 327. The decision in *Mosley* was recently distinguished by the Court in *Arizona v. Roberson*, —— U.S. ——, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), a case in which the *Edwards* rule was applied to bar a police-initiated interrogation on a separate crime, on the ground that a suspect's decision to cut off questioning, unlike his request for counsel, does not raise the presumption that he is unable to proceed without a lawyer's advice.

lege under the Fifth Amendment not to be compelled to incriminate himself. The cornerstone of its decision, however, was the Court's declaration that the privilege was "available outside of criminal court proceedings and serves to protect persons *in all settings in which their freedom of action is curtailed in any significant way* from being compelled to incriminate themselves." *Id.* at 467, 86 S.Ct. at 1624 (emphasis added). This was because the Court had concluded that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*

Later decisions by the United States Supreme Court have made it clear that the Fifth Amendment privilege to have an attorney present during interrogation must be asserted by the individual and is not triggered automatically by the initiation of the interrogation itself. *See Moran v. Burbine,* 475 U.S. at 433 n. 4, 106 S.Ct. at 1147–48 n. 4; *Michigan v. Mosley,* 423 U.S. at 104 n. 10, 96 S.Ct. at 326 n. 10. *See also Michigan v. Jackson,* 475 U.S. 625, 638 n. 2, 106 S.Ct. 1404, 1412 n. 2, 89 L.Ed.2d 631 (1986) (Rehnquist, J., dissenting) (*"Miranda* confers upon a defendant a 'right to counsel,' *but only when such counsel is requested during custodial interrogations."*). However, this does not imply that an individual's pre-custodial assertion of his privilege will trigger the full panoply of protective measures that have come into existence as a result of *Miranda* and its progeny. The goal of *Miranda* was to dissipate the compulsion inherent in custodial interrogation. *Moran,* 475 U.S. at 425, 106 S.Ct. at 1143. The decision struck a balance between the two competing concerns implicit in custodial interrogations: one, the need for police questioning as a tool for effective enforcement of criminal laws; and two, the recognition that the interrogation process is inherently coercive and of the substantial risk that police might cross the line between legitimate questioning and constitutionally impermissible compulsion. *Id.* at 426, 106 S.Ct. at

1144. That balance was struck "by giving the *defendant* the power to exert some control over the course of the interrogation." *Id.* (emphasis in opinion). The defendant in our case wishes to overset this balance by giving a suspect the power to exert control over the entire criminal investigation by invoking his *Miranda* rights prior to being taken into custody, thus automatically rendering invalid his waiver during the ensuing custodial interrogation.

I can find no United States Supreme Court case that deals squarely with the issue presented by our defendant. The defendant has presented several cases from other state jurisdictions in support of his argument, none of which provides persuasive authority for his position. I am guided in my decision, instead, by the Fifth Amendment cases from *Miranda* to, most recently, *Arizona v. Roberson,* — U.S. ——, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). There the Court reiterated its position that the *Edwards* rule provides "clear and unequivocal" guidelines to the law enforcement profession. "Surely there is nothing ambiguous about the requirement that *after a person in custody has expressed his desire to deal with the police only through counsel,* he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Id.* at ——, 108 S.Ct. at 2098 (quoting *Edwards,* 451 U.S. at 484–485, 101 S.Ct. at 1885) (emphasis added). The defendant in this case was taken into custody on Nov. 6 and informed of his *Miranda* rights. He stated to the police that he understood his rights. At no time during his custodial interrogation did he express his desire to deal with the police only through counsel. The rule in *Edwards* is inapposite in this case to invalidate his waiver.

■ The next argument raised by defendant's motion implicates several doctrines. First, defendant contends that the actions of the police in this case were so egregious as to deny him the fundamental fairness guaranteed by the Due Process

Clause of the Fifth Amendment. He further argues that the police conduct rendered involuntary any statements made by him on Nov. 6. In addition, defendant claims that the police violated the *per se* rule of *Weber v. State*, Del.Supr., 457 A.2d 674 (1983), when they failed to inform the defendant on Nov. 6 that his attorney was trying to contact him, thus precluding a finding that defendant's waiver of his right to remain silent and right to counsel was knowing, intelligent and voluntary.

The defendant cites as egregious police conduct the fact that the police wanted to get the truth out of the defendant without his being assisted by counsel and used several means to accomplish this. In particular, they ignored defendant's prior invocation of his right to counsel and failed on Nov. 6 to inform defendant's attorney of the defendant's arrest. When they took the defendant into custody, the police enlisted the aid of defendant's father in an attempt to elicit the information they wanted. They also delayed contacting defendant's mother since it was she who had arranged for a lawyer in the first place. Finally, the police failed to inform the defendant that his attorney was trying to contact him at the barracks.

While it is true that the police were energetic in their search for the truth about the victim's disappearance and death and sidestepped defendant's attorney's efforts to shield his client from any custodial interrogation, they violated no rights of the defendant. I cannot conclude that the police conduct here reaches the level of misconduct that "shocks the conscience" and "offend[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *See Rochin v. California*, 342 U.S. 165, 169–172, 72 S.Ct. 205, 208–209, 96 L.Ed. 183 (1952) (quoting *Malinski v. New York*, 324 U.S. 401, 416–417, 65 S.Ct. 781, 788–789, 89 L.Ed. 1029 (1945)).

■ In determining the voluntariness of a confession, the test is whether the confession was the "product of an essentially free and unconstrained choice by its maker."

*See Fullman v. State*, Del.Supr., 389 A.2d 1292, 1296 (1978) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). If made voluntarily, a confession may be used against its maker. If, on the other hand, the confession was the result of the defendant's will being overborne, the use of the confession offends due process. *Id.* (citation omitted). The Court must determine whether a defendant's will was overborne in a particular case by assessing the totality of the circumstances, that is, both the characteristics of the accused and the details of the investigation. *Id.*

In this case, the defendant was 18 years old at the time of the interrogation, a high school graduate, described as reasonably intelligent and not observed to have been intoxicated on the day in question. Although it does not appear in the record that the defendant had had any previous dealings with the police and the criminal justice system, the defendant had been well advised of his constitutional rights. Before being taken into custody, he had been fully apprised of them by his retained counsel on several occasions. After being taken into custody and before his interrogation by the police, the defendant had been read the *Miranda* warnings. He also had had the opportunity to consult with his father before speaking with the police. The interview did not take place after a prolonged detention. Nor were there any allegations of physical punishment, such as the deprivation of food or sleep. In short, there is no evidence of duress, coercion, deception or promises made by the police in this case. *See DeShields v. State*, Del.Supr., 534 A.2d 630, 653–654 (1987), *cert. denied, DeShields v. Delaware*, —— U.S. ——, 108 S.Ct. 1754, 100 L.Ed.2d 217 (1988). Based on the totality of these circumstances, I conclude that the defendant's confession was voluntary.

■ Defendant has also raised the issue of the voluntariness of his waiver. *Miranda* holds that a defendant may waive his constitutional rights as conveyed by the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384

U.S. at 444, 86 S.Ct. at 1612. This necessitates a two-part inquiry. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141. Second, the person making the waiver must have had "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* If both inquiries are satisfied upon review of the totality of the circumstances surrounding the interrogation, a court may conclude that the *Miranda* rights have been waived.

In an attempt to show that his waiver of *Miranda* rights was not knowing and intelligent, defendant has cited *Weber* which established the rule in Delaware that:

> if prior to or during custodial interrogation, and unknown to the suspect, a specifically retained or properly designated lawyer is actually present at a police station seeking an opportunity to render legal advice or assistance to the suspect, and the police intentionally or negligently fail to inform the suspect of that fact, then any statement obtained after the police themselves know of the attorney's efforts to assist the suspect, or any evidence derived from any such statement, is not admissible on any theory that the suspect intelligently and knowingly waived his right to remain silent and his right to counsel as established by *Miranda.*

457 A.2d at 686 (citations omitted). Jack Rubin had called the barracks while defendant was talking with his father and had admonished the detective not to interrogate the defendant. The defendant was not informed of this fact and now seeks to have his waiver invalidated on this ground.

One difficulty with defendant's argument is that the Supreme Court has explicitly stated that "[t]o effectively invoke this rule, the attorney *must present himself* at the police station or other site of interrogation and have a bona fide right ... to hold himself out as the suspect's counsel." *Id.* (emphasis added). However, it will not be

necessary to discuss defendant's contention that requiring an out-of-state attorney to appear in person at the station unfairly discriminates against a defendant who chooses not to be represented by local counsel. This is because the authority of *Weber* has been undermined by the recent United States Supreme Court decision of *Moran v. Burbine,* which held that the failure of the police to inform a suspect of his attorney's telephone call did not invalidate an otherwise proper waiver by the suspect of his Fifth Amendment rights. 475 U.S. at 422, 106 S.Ct. at 1142.

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result..... Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 422–423, 106 S.Ct. at 1141–1142.

Defendant attempts to avoid the impact of *Moran* by claiming that *Weber* was decided on state constitutional grounds. This claim is not substantiated by the Supreme Court's analysis in *Weber.* Furthermore, the Court recently stated, in a case involving waiver of a suspect's Fifth Amendment and Sixth Amendment right to counsel, that it has not in the past construed Art. I § 7 of the Delaware Constitution as affording defendants greater rights than the federal constitution. *See Lovett v. State,* Del. Supr., 516 A.2d 455, 465 (1986), *cert. de-*

*nied, Lovett v. Delaware,* 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987).

For all the same reasons as stated in my "totality of the circumstances" analysis above, I conclude that defendant's waiver of his Fifth Amendment right to remain silent and right to counsel was knowing, intelligent and voluntary.

 Defendant's last argument is based on the Sixth Amendment. He claims that the theft and the murder were so interrelated that his Sixth Amendment right to counsel had attached to both as of the time of his preliminary presentment and preliminary hearing on the theft charge. Defendant's incriminating statement taken on Nov. 6 without his attorney being present, therefore, constituted a violation of his constitutional right.

Defendant presented himself and was arraigned on the theft charge on Oct. 22, 1987. On Oct. 29, he waived his preliminary hearing. There is no doubt that his Sixth Amendment right to counsel on the theft charge attached as of the initiation of judicial proceedings against him on Oct. 22. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, *reh'g denied,* 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240 (1977); *Deputy v. State,* Del.Supr., 500 A.2d 581 (1985), *cert. denied, Deputy v. Delaware,* 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987). On Nov. 6, 1987, defendant was arrested for murder. He made his statement to the police on the same day, prior to any commencement of adversary judicial proceedings such as "a formal charge, preliminary hearing, indictment, information or arraignment." *Deputy,* 500 A.2d at 590 (citation omitted). Defendant's contention that his right to counsel on the murder charge had already attached, therefore, is incorrect and, furthermore, untenable in light of *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

In *Maine v. Moulton,* the United States Supreme Court held that incriminating statements pertaining to pending charges obtained from the accused were inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to counsel. 474 U.S. at 180, 106 S.Ct. at 490. However, the Court made clear that incriminating statements *pertaining to other crimes, as to which the Sixth Amendment right had not yet attached,* were admissible at a trial of those offenses. *Id.* at n. 16 (emphasis added). The Court later confirmed its analysis that the initiation of adversary judicial proceedings, "far from being mere formalism, is fundamental to the proper application of the Sixth Amendment right to counsel." *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). *See Arizona v. Roberson,* —— U.S. ——, ——, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704 (1988) (the continuing investigation of uncharged offenses did not violate the defendant's Sixth Amendment right to the assistance of counsel).

For all the foregoing reasons, the defendant's motion to suppress is denied.