Ransford H. BRYAN, III, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: July 6, 1989.
Decided: March 2, 1990.
Rehearing Denied March 20, 1990.

John M. Sandy, Georgetown, Jack B. Rubin (argued), and Lee Gordon, Baltimore, Md., of counsel, for appellant.

William L. George, Jr. (argued), and Lillian M. Moore, Dept. of Justice, Wilmington, for the State.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en banc.

MOORE, Justice.

Ransford H. Bryan, III, was convicted by a jury of murder in the first degree, possession of a deadly weapon during the commission of a felony, and theft of over $500 by false pretenses. Bryan contends that the trial court erred in denying his motion to suppress a confession made to police during a custodial interrogation despite his attorney's repeated admonitions not to question the defendant in the absence of counsel. Moreover, the interrogation of

Bryan commenced despite the fact that counsel for Bryan had contacted the police investigators following Bryan's arrest and had specifically warned the police not to question the suspect in his absence.

Bryan raises several issues on appeal, but we address only one: Whether a knowing waiver of the right to counsel, guaranteed in Delaware by article I, § 7 of the Constitution of 1897,[1] can occur when the State prevents counsel, whom the State knows has been designated and retained to represent the defendant, from rendering effective legal assistance to his client during a custodial interrogation. In our opinion such police conduct is thoroughly incompatible with fundamental principles of the Delaware Constitution. Accordingly, we reverse.

## I.

The defendant was an 18 year old youth who had had no previous dealings with the criminal justice system. He had just graduated from high school and was living with a friend, Douglas Brockway, Jr.

On October 13, 1987, Brockway told his mother that he believed someone had been stealing money from his bank account using his Money Access Card (MAC). She advised him to contact his bank. The next day, October 14, Brockway went to the bank with his father and signed an affidavit of forgery alleging that money had been withdrawn from his account without his permission on four separate occasions, totaling $810.[2] Later that day, Bryan's mother observed Brockway holding Bryan against a wall and threatening him; he said "If I find out that you are—that you did this, it is going to be between you and me."

The following day, October 15th, Bryan and Brockway told Brockway's mother that they intended to go squirrel hunting. The boys took a twenty-gauge shotgun with them. There is a dispute as to how the gun was removed from the house. Bryan claims that Brockway's gun was passed through the bedroom window, however, Brockway's mother claims that she saw Brockway carrying Bryan's shotgun with shells in hand out of the front door. In any event, the boys left the house together at approximately 6:30 p.m. About 45 minutes later Bryan returned home, alone.

Immediately upon returning Bryan told Brockway's mother that her son had a drug habit and owed $2,000 to a drug dealer. He also stated that he had made the withdrawals from Brockway's account as part of a conspiracy between Brockway and himself to defraud the bank in order to obtain money to pay off the drug debt. He said that Brockway intended to go to the bank and complain about the theft, get reimbursed, and use the proceeds to pay off the drug debt. He further claimed that Brockway had solicited his help to make the withdrawals in an effort not to alert Brockway's mother. During this discussion Bryan also stated that he and Brockway had not gone squirrel hunting, but had instead gone to a shopping center where Brockway, carrying $1,200, met a Mexican drug dealer. Bryan claimed that Brockway talked to the drug dealer, and then told Bryan that he was leaving with him. Bryan said that he saw Brockway drive off with the drug dealer in a red Pontiac.

The mother claimed that after this discussion she asked Bryan where the shotgun was and he showed her the gun which was in his car. The victim's mother and sister later searched the car. They found nothing except Bryan's wallet in the glove box which contained $300 that was later traced to a Sussex Trust MAC machine.

---

1. Art. I, § 7 provides:
   In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land.
   Del. Const. art. I, § 7.

2. A fifth allegedly unauthorized withdrawal was later discovered bringing the total to $1,110.

When later confronted with this fact by Brockway's sister, the defendant denied any knowledge of the $300 found in his wallet in the glove box.

Detective Warrington of the Delaware State Police began an investigation into the disappearance of Brockway on October 19th. He interviewed the victim's mother, father and Bryan at the victim's house. Bryan participated in this interview voluntarily. During the interview Bryan related the Mexican-drug-dealer story. The interviews left Detective Warrington with some suspicions. Specifically, he was concerned first about the inconsistency concerning the removal of the shotgun from the house. Second, he wondered why Bryan related the drug story to the victim's mother and recanted the squirrel hunting story if the purpose of the squirrel hunting story was to cover up the alleged drug involvement. Third, he was concerned about Bryan's denial of knowledge of the $300 of Sussex Trust MAC money found in his wallet.

The following day, October 20th, Detective Warrington reinterviewed Bryan and Brockway's family, inquiring into the particular inconsistencies in the defendant's story. Detective Warrington also asked Bryan directly at this time if he knew where Brockway was or had any more information regarding his whereabouts. Bryan denied any such knowledge. However, about this time the police received photographs from Brockway's bank showing Bryan withdrawing money from its MAC machine. The last photo showed defendant withdrawing $300 on October 13th. Detective Warrington attempted to get Bryan to take a polygraph test, but his mother stated that retained counsel had advised against it, and that Bryan would not take the test.

On October 21st, Bryan's retained counsel, Jack Rubin, (Rubin) a Baltimore lawyer, called Detective Warrington and told him that Bryan would not submit to a polygraph, and that he was not to interrogate Bryan unless there was a warrant for his arrest. Both Bryan and his mother were in Rubin's office during the call. Detective Warrington then told Rubin that he did in fact have a warrant for Bryan's arrest on charges of theft. Rubin then arranged for Bryan to turn himself in the following day and clearly stated to Detective Warrington that he was not to question Bryan and was to deal with the defendant only through counsel.

The following day, October 22, Bryan turned himself in on the theft warrant and was arraigned by a Justice of the Peace. Bryan was accompanied by a local Delaware attorney, who was co-counsel with Rubin. Detective Warrington did not request to question Bryan on this occasion. However, some time later, Detective Warrington telephoned Bryan's Delaware attorney and stated that, as a part of his investigation into Brockway's disappearance, he wanted more information from Bryan. Bryan's Delaware attorney advised Detective Warrington to contact Rubin concerning that request.

Thereafter, Detective Warrington spoke to Rubin, stressing his need for more information. Rubin stated that he would speak with Bryan. On October 27, Detective Warrington called Rubin to see if he had obtained any additional information concerning the whereabouts of Brockway. During that telephone call, Rubin and Detective Warrington scheduled a meeting in Delaware, at the State Police barracks near Lewes, for the following day. At the meeting Rubin again informed Detective Warrington that the police were not to question Bryan and that all contact between the police and Bryan was to be through Rubin.

In the meantime, a preliminary hearing on the theft charge had been scheduled for October 29. Rubin was becoming concerned that the theft charge and arrest were being used to coerce Bryan into giving a statement regarding the disappearance of Brockway. On October 29, Bryan, who was accompanied by his Delaware attorney and Rubin, appeared and waived his right to a preliminary hearing. Following Bryan's waiver of a preliminary hearing, Rubin confronted Warrington with his concern. Warrington acknowledged that the theft charge and investigation into Brockway's disappearance were "all interrelat-

ed." Consequently, while they were still in the Sussex County Courthouse, Rubin again told Warrington, in Bryan's presence, that Bryan had asserted his right to remain silent and wished to deal with the police only through counsel.

During the following week police continued their investigation and attempted to verify Bryan's story about the Mexican drug dealer and his assertions that Brockway was heavily involved in drugs. They were unsuccessful.

On November 6th two deer hunters found a body in a wooded area near Route 277. The body was clad in a green and white tee shirt matching the description of the tee shirt Brockway was wearing at the time of his disappearance. There were holes in the upper torso of the body consistent with multiple shotgun wounds.

Later that afternoon Detective Warrington and another police officer went to the defendant's father's residence and informed him that Brockway's body had been found and that they intended to arrest Bryan for murder. Bryan's father was asked to come with them. The reason for this is unclear, however, Detective Warrington testified that Bryan's father agreed to go, and he felt that the father's presence might help "the truth come out." Detective Warrington also testified that "[W]e needed to get the truth out and know exactly what happened that day." When Bryan's father asked Warrington to call Bryan's mother, who had been responsible for hiring Bryan's attorney earlier in the investigation, Warrington indicated that this could be done at the police station.

The police and Bryan's father went to the construction site where Bryan was working. There Bryan was arrested for first degree murder. At the police station Bryan and his father were permitted to talk alone for approximately 30 minutes. During that time the police called Bryan's mother, told her of the arrest, and informed her that Bryan's father was currently talking to her son. Several minutes later Rubin called Detective Warrington and told him again that "you know not to talk to him."

When Bryan's father emerged from the interrogation room he exclaimed, "He says he didn't do it." Two detectives, one of whom was Detective Warrington, immediately entered the room. Bryan was read his *Miranda* warnings but nothing was said to him of Rubin's call. Bryan did not ask for a lawyer and an interrogation ensued, culminating in Bryan making a statement that he accidentally shot Brockway. Bryan then took Detective Warrington to the location where he left the guns and some of the victim's clothing. He acknowledged that his gun inflicted the fatal wounds.

On May 23, 1988, Bryan moved to suppress the statements he made and the tainted evidence flowing from those statements on grounds that the statements were obtained in violation of his rights under the fourth, fifth and sixth amendments to the United States Constitution, and under §§ 6 and 7 of the Delaware Constitution of 1897. The motion was denied by the trial court. *State v. Bryan*, Del.Super., 551 A.2d 807 (1988).

The trial court decided, among other things, that this Court's decision in *Weber v. State*, Del.Supr., 457 A.2d 674 (1983), was inapplicable. Its holding was based on several factors:

(A) The authority of *Weber* has been undermined by *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986);

(B) The holding in *Weber* was not based on the Delaware Constitution and even if it was, art. I, § 7 of the Delaware Constitution grants no greater protection than the fifth amendment of the United States Constitution;

(C) Even if *Weber* was controlling, the test enunciated therein was not satisfied because the defendant's attorney, Rubin, was not physically present at the police station.

*Bryan*, 551 A.2d at 816–18. Today we examine each of these factors, reaffirm our holding in *Weber*, and clearly define the protections afforded by article I, § 7, of the Delaware Constitution with respect to the right to counsel.

## II.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that police advise those whom they subject to custodial interrogation of their constitutional rights. *Id.* at 444, 86 S.Ct. at 1612. Before police may interrogate a suspect in custody, they must obtain a waiver by that suspect of his rights. To be effective, a waiver of rights must be voluntary, knowing and intelligent. *Id.; Weber*, 457 A.2d at 685.

### A.

Our decision today examines the prerequisites for a voluntary, knowing and intelligent waiver of the right to counsel in Delaware. Our most recent examination of the issue was in *Weber*.

There, relying in part, on article I, § 7, of the Delaware Constitution, we held that:

> To ... effectuate the protection given to the accused by *Miranda,* and ensure that a suspect knowingly and intelligently waives his rights, we establish the following rule for the guidance of the trial court: if prior to or during custodial interrogation, and unknown to the suspect, a specifically retained or properly designated lawyer is actually present at the police station seeking an opportunity to render legal advice or assistance to the suspect, and the police intentionally or negligently fail to inform the suspect of that fact, then any statement obtained after the police themselves know of the attorney's efforts to assist the suspect, or any evidence derived from any such statement, is not admissible on any theory that the suspect intelligently and knowingly waived his right to remain silent and his right to counsel as established by *Miranda.*

*Weber*, 457 A.2d at 686. Weber was decided in the context of a lawyer being present at a police station and attempting to render legal advice to his client. *Id.*

■ For purposes of the protections afforded by the Delaware Constitution, there is no distinction between an in-person request by retained counsel to render assistance to his client and a telephonic request by that lawyer. The relevant inquiry is not whether counsel is physically present at the interrogation site, but simply whether specifically retained counsel has made a reasonable, diligent and timely attempt to consult with his client or otherwise render legal services.[3]

■ The denial of the assistance of counsel is a violation of the due process of law guaranteed by article I, § 7 of the Delaware Constitution. Accordingly, the procedural protections afforded by the Delaware Constitution demand that an accused be afforded the unqualified opportunity to consult with counsel prior to custodial interrogation, provided that (i) the lawyer has clearly made a reasonable, diligent and timely attempt to render legal advice or otherwise perform legal services on behalf of his client, the accused, and (ii) the lawyer has been specifically retained or designated to represent the accused.

■ Furthermore, when counsel has been specifically designated and retained to represent a suspect and the suspect has clearly made police aware of his desire to deal with police only through his counsel during the investigation leading to the arrest, we impose a heavy presumption against waiver if the lawyer is present and denied access to his client, or, as here, has repeatedly advised the police that no interrogations of the defendant were to occur. We adopt this presumption because an abrupt decision by a suspect to waive his right to counsel without counsel being present, after previously expressing a desire to have his lawyer present, undermines any notion of a knowing, voluntary and intelligent waiver. The Supreme Court has expressed a similar concern: " '[T]he accused having expressed his own view that he is not competent to deal with the author-

---

**3.** We view the attempt to invoke the right to counsel by an attorney on behalf of a client as a form of legal assistance or advice. We therefore perceive no distinction between a lawyer who tells police: "Don't interrogate my client" and one who says, "I want to consult with my client."

ities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.' " *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988) (quoting *Michigan v. Mosley*, 423 U.S. 96, 110 n. 2, 96 S.Ct. 321, 329 n. 2, 46 L.Ed.2d 313 (1975) (White, J. concurring in result)).

■ Although this presumption bears some resemblance to the New York rule, under which a suspect may never waive his right to counsel in the absence of his attorney, we specifically decline to adopt that principle, and reaffirm our decision in *Weber* to that effect. *Weber*, 457 A.2d at 686 (declining to adopt New York rule set forth in *People v. Hobson*, N.Y.Ct.App., 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976) and *People v. Arthur*, N.Y.Ct. App., 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968)). *See also State v. Stoddard*, 206 Conn. 157, 537 A.2d 446, 452–53 (1988) (declining to adopt strict New York rule). The presumption does not alter the principle that a suspect may knowingly, intelligently and voluntarily waive his right to counsel, even without consulting with his counsel, after first being informed of counsel's efforts. *See Weber*, 457 A.2d at 686. The presumption reflects the additional weight accorded the "factor" or "circumstance" of a consistent prior course of dealing with police under a totality of circumstances analysis, required before a waiver will be considered knowing, voluntary and intelligent. *Howard v. State*, Del. Supr., 458 A.2d 1180, 1183 (1983). As we have previously held, " 'the totality of the circumstances include[s] the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, *and all other pertinent factors.*' " *Id.* (emphasis added) (quoting *Whalen v. State*, Del.Supr., 434 A.2d 1346, 1351 (1981)). *See*

*also Traylor v. State*, Del.Supr., 458 A.2d 1170, 1176 (1983).

■ In evaluating the totality of the circumstances, a court makes a two-part inquiry. First, the waiver must have been voluntary—it must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. Second, the waiver must have been made upon "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, a purported waiver can never satisfy a totality of the circumstances analysis when police do not even inform a suspect that his attorney seeks to render legal advice. *Weber*, 457 A.2d at 686.

■ We recognize that a defendant's right to have counsel present during questioning is his own; the decision whether to waive his right can only be made by the defendant and he need not follow the advice of his lawyer. *See Stoddard*, 537 A.2d at 452 (recognizing that the defendant alone may only invoke and waive the right to counsel). Our holding simply recognizes that to knowingly, voluntarily and intelligently waive this right a defendant must be informed that his counsel has attempted or is attempting to render legal advice or perform legal services on his behalf. To hold otherwise would be to condone "affirmative police interference in a communication between an attorney and suspect." *Moran*, 475 U.S. at 456, n. 42, 106 S.Ct. at 1159, n. 42 (Stevens, J. dissenting).

## B.

■ In reaching our decision we clarify the confusion in the trial court as to the difference in the protections afforded by article I, § 7, of the Delaware Constitution and by the fifth amendment to the United States Constitution.[4] In *Moran v. Bur-*

---

4. In *Lovett v. State*, Del.Supr., 516 A.2d 455 (1986), we noted that we had "not in the past construed Art. I, § 7 of the Delaware Constitution as affording defendants greater rights than the federal constitution." *Id.* at 465. We note, however, that *Lovett* addressed the issue of what constitutes post-invocation initiation of discus-

sions by an accused. *Id.* at 464. Today we examine a different issue, specifically, whether art. I, § 7, requires that an accused be notified that his counsel, who is not physically present at the interrogation site, is attempting to render legal advice before a knowing and intelligent waiver can occur.

*bine*, the United States Supreme Court held that events occurring outside the presence of a suspect have no bearing on his ability to knowingly, voluntarily and intelligently waive his right to counsel under the fifth amendment of the United States Constitution. *Moran*, 475 U.S. at 423, 106 S.Ct. at 1141–42. Accordingly, the Supreme Court refused to adopt a rule requiring police to inform a suspect of an attorney's efforts to reach him. *Id.* at 425, 106 S.Ct. at 1142–43. Nonetheless, *Moran* invited the States to adopt a more stringent rule under their own constitutions. *Id.* at 428, 106 S.Ct. at 1144–45. We do so here on independent State grounds.

Thus, in *Weber* we concluded that "a suspect, who is indifferent to the usual abstract offer of counsel, recited as part of the warnings required by *Miranda*," will not disdain an opportunity to consult with counsel he has specifically retained. *Weber*, 457 A.2d at 685. *See also Moran*, 475 U.S. at 455–56, 106 S.Ct. at 1158–59 (Stevens, J. dissenting) (recognizing that a majority of the state courts recognize the significance of pre-interrogation discussion with identified counsel). It is undisputed that the Delaware Constitution may provide broader protections than the United States Constitution. *Van Arsdall v. State*, Del.Supr., 524 A.2d 3, 7 n. 5 (1987) (citing *Goddard v. State*, Del.Supr., 382 A.2d 238, 240 n. 4 (1977)). This principle was expressly recognized in *Moran:* "Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Moran*, 475 U.S. at 428, 106 S.Ct. at 1144. Accordingly, we decide this issue solely under article I, § 7 of the Delaware Constitution. *See also Hammond v. State*, Del.Supr., 569 A.2d 81 (1989). This is in accord with the holdings of the highest courts of other states when presented with a situation analogous to that in *Moran*. *State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988); *Haliburton v. State*, Fla. Supr., 514 So.2d 1088 (1987).

### III.

This brings us to an application of the foregoing legal principles. The trial court's findings of fact reveal deliberate, intentional and willful police conduct intended to subvert the protections afforded by the Delaware Constitution. Under the circumstances, the requirement of a knowing and voluntary waiver of counsel is of paramount importance to any inquiry.

The defendant made police aware of his desire to deal with them only through retained counsel on at least five occasions during the investigation and prior to his arrest.[5] In that period, virtually all of the contact between the investigating officers and the defendant occurred in the presence of counsel. After the defendant's arrest Rubin contacted police and advised them again that they were not to interrogate the defendant in his absence.

Instead, the police disregarded these assertions of the defendant's rights and purportedly obtained a waiver of those rights without informing the defendant of his lawyer's latest attempt to render services on his behalf. The police then immediately interrogated the defendant and obtained a confession. Under such circumstances the defendant could not waive his right to counsel without first being informed that his lawyer was on the phone and was attempting to render legal advice. At a minimum, the defendant had an absolute right to know these facts, and any statement obtained from him violative of this right cannot pass muster under the Delaware Constitution. Del. Const. art. I, § 7.

Accordingly, the use of the confession against Bryan at trial, and evidence derived from it, constituted error. We therefore REVERSE and order a new trial.

---

**5.** The undisputed facts show contact between counsel and the police on October 21, at the arraignment on October 22, a phone discussion on October 27, an in-person conference at the police station on October 28, and in-person contact again on October 29 after waiver of the preliminary hearing. During each of these occasions Rubin advised Detective Warrington that the defendant asserted his right to remain silent and the right to have counsel present during any police questioning.