CAVANAGH, J.
(dissenting). In People v Bender, 452 Mich 594, 620; 551 NW2d 71 (1996) (opinion by CAVANAGH, J.); id. at 623 (opinion by Brickley, C.J.), we held that police cannot conceal from suspects that counsel has been made available to them.[1] Although that decision has stood for nearly 20 years, today the majority casts Bender aside as “wrongly decided.” Because I continue to believe that Bender correctly announced a rule firmly rooted in the Michigan Constitution, I dissent.
I. INTRODUCTION
The majority explains its decision by first stating that, in Moran v Burbine, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), the United States Supreme Court reached the opposite conclusion. However, as the majority acknowledges, the divergent results in Moran and Bender cannot support the majority’s conclusion that Bender was wrongly decided. Indeed, according to the United States Supreme Court, “a State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.” Oregon v Hass, 420 US 714, 719; 95 S Ct 1215; 43 L Ed 2d 570 (1975), citing Cooper v California, 386 US 58, 62; 87 S Ct 788; 17 L Ed 2d 730 (1967), and Sibron v New York, *258 392 US 40, 60-61; 88 S Ct 1889; 20 L Ed 2d 917 (1968). Moreover, Moran extended this broad premise to the exact issue at hand, stating, “[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law.” Moran, 475 US at 428. Finally, we have consistently concluded that we are not bound in our understanding of the Michigan Constitution by any particular interpretation of the United States Constitution. See, e.g., Harvey v Michigan, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003).
Given that we are clearly free to interpret our Constitution more broadly than the United States Supreme Court has interpreted the federal Constitution, and the United States Supreme Court has permitted the creation of rules like the one from Bender, one must ask what is so wrong about Bender that it must be abandoned after nearly two decades of problem-free application in our state? According to the majority, Michigan’s Constitution does not support Bender’s rule. I disagree.
Although the language of Const 1963, art 1, § 17,[2] is nearly identical to the language in the Fifth Amendment of the United States Constitution,* *[3] that does not necessarily indicate that we must interpret our Constitution in a manner consistent with the United States Supreme Court’s interpretation of the federal Constitution. Rather, when interpreting the Michigan Constitution, we must recognize the law as it existed in Michigan at the time the relevant constitutional provision was adopted, and “it must be presumed that a constitutional provision has been framed and adopted *259 mindful of prior and existing law and with reference to them.” People v Kirby, 440 Mich 485, 492; 487 NW2d 404 (1992). Accordingly, I will begin with a review of an opinion decided long before the ratifiers adopted the 1963 Constitution and cited for support in People v Wright, 441 Mich 140; 490 NW2d 351 (1992), and Bender: People v Cavanaugh, 246 Mich 680; 225 NW 501 (1929).
II. PEOPLE v CAVANAUGH: THE ORIGIN OF BENDER’S FOUNDATION IN THE MICHIGAN CONSTITUTION
In support of its conclusion that Bender is not rooted in the Michigan Constitution, the majority toils away for page after page of analysis arguing that the Michigan Constitution only protects a suspect from involuntary confessions. Moreover, the majority limits the scope of “involuntary confessions” to only those confessions that satisfy the dictionary definition of “compelled.”
The result is that in the majority’s view, a confession is inadmissible under art 1, § 17 only if the confession is obtained through “the use of coercion, violence, force, or pressure. . . .” Ante at 225. In fact, the majority concludes that our caselaw “focused entirely on the voluntariness of the confession,” which only excludes confessions “ ‘secured by inflicting physical force or its equivalent by means of harsh or cruel treatment....’” Ante at 240 quoting People v Louzon, 338 Mich 146, 153-154; 61 NW2d 52 (1953) (emphasis added).[4]
*260 The problem with the majority’s view is twofold: first it is rooted in a hyper-textualist analysis of the word “compelled” in art 1, § 17, an approach rejected in this area of law by the United States Supreme Court in Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and throughout Miranda’s progeny. See, e.g., Edwards v Arizona, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981) (explaining the protections applicable when an accused invokes the right to have counsel present during custodial interrogation). Second, the majority singularly focuses on pr e-Miranda caselaw. Not surprisingly, that pre-Miranda caselaw does not use the terminology adopted in Miranda to explain the “knowing and intelligent” requirements. Thus, by focusing exclusively on the fact that preMiranda caselaw used the “voluntary confession” terminology, the majority determines that the preMiranda caselaw only prohibited the use of confessions obtained by “inflicting physical force” or “cruel treatment.” However, simply because Michigan’s preMiranda caselaw did not use the terminology adopted in Miranda does not necessarily mean that our caselaw did not adopt an understanding of art 1, § 17 that is broader than the hyper-textualist meaning espoused by the majority. Rather, we must consider the actual interrogation circumstances in those pr e-Miranda opinions to determine whether we have historically interpreted our state Constitution to provide broader protection against self-incrimination than is provided in the federal Constitution.
In 1929, long before adoption of the 1963 Michigan Constitution, we considered a case in which the police *261 denied counsel’s request to speak with his client, whom the police were interrogating. Cavanaugh, 246 Mich at 687. In Cavanaugh, we found the police conduct impermissible, stating:
“[HJolding an accused incommunicable, is condemned by every principle of fairness,... is forbidden by the constitutional guaranty of due process of law, and inhibited by the right of an accused to have the assistance of counsel.... Holding an accused incommunicable to parents and counsel is a subtle and insidious method of intimidating and cowing ....” [Id. at 686 (emphasis added).]
Cavanaugh also provided, “In this State . . . police [may not], having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused.” Id. at 688 (emphasis added).
As I explained in Wright, “it is clear that Cavanaugh, in view of its reference to the law l[i\n this State,’ . . . was not referring to any rights under the federal constitution; rather, it was referring to the rights existing under our state constitution.” Wright, 441 Mich at 158 (opinion by CAVANAGH, C.J.) (emphasis added). Indeed, this Court later concluded that Cavanaugh relied on “the Michigan constitutional guarantee of due process,” which was then contained in Const 1908, art 2, § 16, and is now found in the constitutional provision at issue — Const 1963, art 1, § 17. People v Conte, 421 Mich 704, 722; 365 NW2d 648 (1984).
After understanding that Cavanaugh interpreted the Michigan Constitution, the next question is whether Cavanaugh interpreted the state constitutional language more broadly than the language of its federal counterpart. As previously noted, Cavanaugh concluded that “holding an accused incommunicable ... is forbidden by the constitutional guaranty of due process *262 of law, and inhibited by the right of an accused to have the assistance of counsel.” Cavanaugh, 246 Mich at 686 (emphasis added). Holding a suspect “incommunicable” is substantially different from “inflicting physical force” or “cruel treatment,” which, according to the majority, is the only type of “compulsion” that the Michigan Constitution prohibited pre-Miranda. Nevertheless, Cavanaugh concluded that the defendant’s confession was obtained in violation of what is now art 1, § 17 of the Michigan Constitution. Thus, the majority’s claim — that we have not previously interpreted Michigan’s Constitution to provide protection against self-incrimination except with respect to confessions obtained by “ ‘inflicting physical force’ ” or “ ‘by means of harsh or cruel treatment,’ ” ante at 240 (citation omitted) — is inconsistent with Cavanaugh.
In order to sidestep this inconsistency, the majority argues that Cavanaugh is distinguishable from Bender because Cavanaugh concluded that the defendant’s confession was not voluntary, whereas Bender concluded that the defendant’s waiver of rights was not made knowingly. The majority is correct that Cavanaugh did not mention whether the defendant’s waiver of rights was made “knowingly” under the Michigan Constitution and instead referred to the “voluntariness” of the confession. However, as previously discussed, that is not surprising, given that Cavanaugh was decided 37 years before Miranda established the “knowing and intelligent” terminology referred to in Bender. Yet, concluding that Cavanaugh did not create the foundation for Bender on these grounds is, in my opinion, an oversimplification of Cavanaugh.
In my view, Cavanaugh foreshadowed Miranda’s understanding of the nature of the right protected by the constitutional guarantee that a person will not be *263 “compelled” to be a witness against himself. Because Cavanaugh referred to the “voluntariness” of the defendant’s confession, the majority insists that Cavanaugh is nothing more than a typical “voluntariness” case. As a result, the majority assumes that Cavanaugh concluded that the confession was the product of impermissible “compulsion,” which the majority defines as “the use of coercion, violence, force, or pressure . . . .” Ante at 225. However, by focusing on only the terms used in Cavanaugh, the majority overlooks the context in which the terms were used as well as the fact that Cavanaugh never mentioned the types of “compulsion” the majority discusses. In fact, a police officer whose testimony described the interrogation in Cavanaugh stated that the defendant “was not threatened in any manner by the officers nor was he offered any hope of reward nor any promises held to him for the signing of the statement.. . .” Cavanaugh, 246 Mich at 686-687. Rather, Cavanaugh only referred to the impermissibility of “holding an accused incommunicable.” Id. at 686 (emphasis added). See, also, id. at 688 (noting that “[t]he defendant was held incommunicable”) (emphasis added).
Critically, incommunicado interrogation was at the center of the United States Supreme Court’s explanation of the “knowing and intelligent” requirement in Miranda: “The current practice of incommunicado interrogation is at odds with one of our Nation’s most cherished principles — that the individual may not be compelled to incriminate himself.” Miranda, 384 US at 457-458 (emphasis added). Moreover, Miranda expressly acknowledged that incommunicado interrogation is not like coercion, violence, force, or pressure that the majority in this case discusses. See id. at 457 (“To be sure, [incommunicado interrogation] is not physical intimidation . . . .”). Nevertheless, Miranda concluded *264 that incommunicado interrogation “is equally destructive of human dignity,” id., and, therefore, violates a suspect’s privilege against self-incrimination.
Because Cavanaugh’s explanation of the impropriety of the incommunicado interrogation methods used to extract the defendant’s confession is strikingly similar to the impermissible interrogation methods that Miranda discussed, Cavanaugh is, in my view, more properly classified as consistent with Miranda’s “knowing and intelligent” standard. Stated differently, although Cavanaugh did not use the yet-to-be-created Miranda terminology, Cavanaugh nevertheless is consistent with Miranda’s analysis and conclusion concerning knowing and intelligent waivers because Cavanaugh did not address coercive police conduct that affected the voluntariness of a suspect’s confession.[5] The majority rejects this view and instead concludes that Cavanaugh never “hinted that a defendant must have some idea of his or her ‘rights’. . . .” Ante at 242. I disagree because, in my view, an obvious result of holding a suspect incommunicado is that the suspect will lack knowledge of his or her rights, a conclusion that is even truer when the suspect is unaware that counsel, who could educate the suspect on those rights, is actively seeking to communicate with the suspect. Thus, in my view, Cavanaugh evidences that this Court did not interpret the Michigan Constitution to prohibit only confessions obtained by “inflicting physical force” or “cruel treatment.” When viewed in this light, Cavanaugh supports Bender’s conclusion that denying *265 counsel’s request to communicate with a suspect amounts to impermissible incommunicado interrogation in violation of Const 1963, art 1, § 17.[6]
The majority also attempts to distinguish Cavanaugh from Bender by arguing that Miranda protects only against police coercion and Bender therefore “falls considerably outside the scope of the custodial interrogation process which defined the constitutional rationale for Miranda.” Ante at 246, citing Colorado v Connelly, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986). Accordingly, the majority appears to argue that there is no material difference between the preMiranda test to determine whether a suspect’s confession was voluntary and the post -Miranda test to determine whether a suspect’s waiver was “knowing and intelligent.” However, that approach ignores that Miranda requires analysis of two distinct prongs — the voluntariness prong and the knowing and intelligent prong. Thus, the majority makes the
fallacious assumption of a complete unity between the determinative factors of the pre-Miranda Fourteenth Amendment due process analysis (which was concerned solely with coercive police conduct that affected the voluntariness of a suspect’s confession) and the post -Miranda waiver analysis (which requires analysis of two distinct *266 prongs, only one of which — i.e., voluntariness — is logically, or in any other respect, related to coercive police practices). [People v Cheatham, 453 Mich 1, 52-53; 551 NW2d 355 (1996) (Cavanagh, J., concurring in part).]
Connelly does not, however, support the majority’s conclusion that Miranda protects only against police coercion. Rather, Connelly simply held that “coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntary ’ within the meaning of the Due Process Clause of the Fourteenth Amendment,” and determined that “[t]here is obviously no reason to require more in the way of a ‘voluntariness’ inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context.” Connelly, 479 US 167, at 169-170 (emphasis added). Thus, although it is unmistakable that coercive police conduct is as necessary to a finding of involuntariness under Miranda as it is under the substantive protection of the Fourteenth Amendment Due Process Clause, “ [i]t is only with respect to the completely distinct ‘knowing and intelligent’ prong of a Miranda waiver analysis . . . that coercive police conduct is not required, either by logic or by law.” Cheatham, 453 Mich at 54 (CAVANAGH, J., concurring in part).
That is not to say that courts should ignore police conduct when applying the knowing-and-intelligent prong of a Miranda analysis. Police conduct may still be relevant to the knowing-and-intelligent prong because “any police conduct that could have an effect on a suspect’s requisite level of comprehension must be factored into the analysis [,]” which was clear before Connelly. Id. at 55. In fact, Moran, the very opinion the majority follows today, recognized that “the ‘deliberate or reckless’ withholding of information is objectionable as a matter of ethics,” but concluded that “such conduct is only relevant to the constitutional validity of a waiver *267 if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.” Moran, 475 US at 423-424 (emphasis added). Accordingly, because Miranda protects suspects against more than just police coercion, Bender is not “outside the scope” oí Miranda.
The majority also argues that Cavanaugh is irrelevant because, in Cavanaugh, the police denied the suspect’s request for counsel, whereas Bender addressed denial oí counsel’s request to communicate with a suspect. However, Cavanaugh clearly encompassed police refusal to honor counsel’s requests to speak to the suspect. Specifically, Cavanaugh quoted police testimony establishing that the police denied a request by the suspect’s father and a request by the suspect’s counsel to speak to the suspect. Cavanaugh, 246 Mich at 686-687. Citing those facts, Cavanaugh condemned the police conduct, stating:
In this State a parent may not be denied the right to see and have conversation with a child in jail and accused of crime. Neither may police, having custody of one accused of crime, deny an attorney, employed by or in behalf of a prisoner, the right to see and advise the accused. [Id. at 688 (emphasis added).]
Thus, Cavanaugh is applicable not only to situations in which the suspect’s request for an attorney is denied, but to situations in which counsel’s request to speak to a suspect is denied, as well.
Finally, the majority argues that Cavanaugh cannot support Bender because Cavanaugh employed a “totality of the circumstances” rule rather than the per se rule applied in Bender. The fact that Cavanaugh and Bender differed on what test should result from police interference with counsel’s efforts to speak to a suspect does not lessen the fact that Cavanaugh and Bender *268 agreed that such police conduct is unconstitutional under the Michigan Constitution. Indeed, the police also ignored the defendant’s express request for counsel in Cavanaugh, but Cavanaugh nevertheless applied a totality of the circumstances rule. As the majority recognizes, were those circumstances to occur today, the subsequent confession would be per se inadmissible under Miranda, 384 US at 474. However, Cavanaugh’s conclusion that ignoring the defendant’s request for counsel was unconstitutional is no less correct today simply because Cavanaugh applied a totality of the circumstances rule rather than the Miranda per se rule. Similarly, Cavanaugh’s conclusion that ignoring counsel’s request to communicate with the suspect was unconstitutional is no less correct today simply because Cavanaugh applied a totality of the circumstances rule rather than the Bender per se rule.
Moreover, as I explained in Bender, “ ‘a purported waiver [of Miranda] can never satisfy a totality of the circumstances analysis when police do not even inform a suspect that his attorney seeks to render legal advice.’ ” Bender, 452 Mich at 616 (opinion by CAVANAGH, J.), quoting Bryan v State, 571 A2d 170, 176 (Del, 1990) (emphasis omitted). “ ‘When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity.’ ” Bender, 452 Mich at 617 (opinion by CAVANAGH, J.), quoting State v Haynes, 288 Or 59, 75; 602 P2d 272 (1979). In fact, “ ‘police deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation and requires a clear principle to safeguard the presumption against the waiver of constitutional rights.’” Bender, 452 Mich at 617 n23 (opinion by CAVANAGH, J.), quoting Moran, 475 US at *269 452 (Stevens, J., dissenting). Accordingly, I continue to believe that the nature of “incommunicado interrogation requires a per se rule that can be implemented with ease and practicality to protect a suspect’s rights to remain silent and to counsel.” Bender, 452 Mich at 617 (opinion by CAVANAGH, J.).
Once it is understood that Cavanaugh prohibited police interference with counsel’s efforts to communicate with a suspect based on the same state constitutional language that was applied in Bender, the next question is whether Bender merely continued to apply Cavanaugh’s previously created rule or, as the majority argues, created a rule that did not exist before Bender. Therefore, I will review Bender and the plurality opinions from Wright, 441 Mich 140, Bender’s predecessor.
III. PEOPLE v WRIGHT AND PEOPLE v BENDER
As the majority explains, Bender resulted in multiple opinions, and only Chief Justice BRICKLEY’s opinion garnered four votes. In addition, as the majority states, Chief Justice BRICKLEY’s opinion labeled the result of its holding a “prophylactic rule.” Bender, 452 Mich at 621 (opinion by BRICKLEY, C.J.). However, I disagree with the majority that the arguably “prophylactic” character of the Bender rule deprives the rule of constitutional status. Bather, considering Chief Justice BRICKLEY’s opinion in its entirety, it is clear that he viewed Bender’s “prophylactic” rule in the same mold as Miranda’s “prophylactic” rule. See id. at 620-621 (expressing a preference to “approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme Court approached the constitutional interpretation task in [Miranda]; namely, by announcing a prophylactic rule”). And, notably, the United States Supreme Court has since explained that *270 although Miranda is labeled a “prophylactic” rule, it is nevertheless a constitutional rule. See Dickerson v United States, 530 US 428, 438-440, 444; 120 S Ct 2326; 147 L Ed 2d 405 (2000).
Moreover, Chief Justice BRlCKLEY’s Bender opinion indisputably recognized the constitutional underpinnings of its analysis. For example, Chief Justice BRICKLEY noted that the case “rather clearly implicates both the right to counsel (Const 1963, art 1, § 20) and the right against self-incrimination (Const 1963, art 1, § 17),” which are “part of the bedrock of constitutional civil liberties ....” Bender, 452 Mich at 620, 621 (opinion by BRICKLEY, C.J.) (emphasis added). Additionally, Chief Justice BRICKLEY determined that “it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal.” Id. at 621 (emphasis added). Thus, Chief Justice BRICKLEY concluded that any other rule would be “insufficient to guarantee a suspect’s constitutional rights.” Id. at 623 (emphasis added).
We also have the benefit of then Justice BRlCKLEY’s further explanation of his Bender opinion by way of his dissent in People v Sexton, 458 Mich 43; 580 NW2d 404 (1998). In Sexton, a majority of this Court concluded that Bender did not apply retroactively and implied that Bender lacks a constitutional basis, as the majority concludes today. However, Justice BRICKLEY explained that Bender’s “very purpose is to protect a suspect’s right to counsel and the privilege against self-incrimination”; therefore, “[t]o deny the constitutional import of [Bender] is to ignore the plain language” of the Bender opinion. Id. at 70 (BRICKLEY, J., dissenting) (emphasis added). Accordingly, Justice BRICKLEY flatly *271 concluded that “the majority’s conclusion that Bender does not implicate a defendant’s constitutional rights [is] wrong and without any viable legal support.” Id. at 72.
Regardless of whether Chief Justice BRICKLEY’s Bender opinion definitively rooted its analysis in the Michigan Constitution, I nevertheless retain my belief that the Bender rule is a product of our Constitution, because art 1, § 17 “requires the police to inform the suspect that a retained attorney is immediately available to consult with him, and failure to so inform him before he confesses per se precludes a knowing and intelligent waiver of his right to remain silent and to counsel.” Bender, 452 Mich at 597 (opinion by CAVANAGH, J.).
As I did in Bender, I continue to recognize that “[u]nder federal law, a waiver is knowingly and intentionally made where no police coercion was involved and where the defendant understands that he has the right to remain silent and that the state intends to use what he says to secure a conviction.” Id. at 612, citing Moran, 475 US at 422-423. However, it is also my opinion that “in Michigan, more is required before the trial court may find a knowing and intelligent waiver.” Bender, 452 Mich at 612 (opinion by CAVANAGH, J.). Specifically, “in order for a defendant to fully comprehend the nature of the right being abandoned and the consequences of his decision to abandon it, he must first be informed that counsel, who could explain the consequences of a waiver decision, has been retained to represent him.” Id. at 612-613. This is true because
“[w]hen that information is withheld, the suspect’s waiver of the right to counsel and to remain silent is more abstract than real, becoming, in effect, a waiver of a theoretical right that is uninformed by the material knowledge that *272 retained counsel, present and available to assist the suspect in the full exercise of his or her rights, is just outside the door.” [Id. at 612 n 16, quoting State v Reed, 133 NJ 237, 274; 627 A2d 630 (1993).]
Stated differently, I am
“unwilling ... to dismiss counsel’s effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel. Miranda warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel only means that for the moment the suspect is foregoing the exercise of that conceptual privilege. Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. We cannot therefore conclude that a decision to forego the abstract offer contained in Miranda embodies an implied rejection of a specific opportunity to confer with a known lawyer.” [Bender, 452 Mich at 612 n 16 (opinion by CAVANAGH, J.), quoting State v Stoddard, 206 Conn 157, 168; 537 A2d 446 (1988) (quotation marks omitted).]
Finally, in response to today’s majority, I reiterate my response to the Bender dissent’s assertion that the Michigan Constitution’s privilege against self-incrimination provides no greater protection than the Fifth Amendment: “when interpreting art 1, § 17, there is an absence of a direct link to federal interpretation of the Fifth Amendment. Thus, it does not logically follow that in interpreting art 1, § 17, we must find compelling reasons to interpret our constitution more liberally than the federal constitution.” *273 Bender, 452 Mich at 613 n 17 (opinion by CAVANAGH, J.). Rather, this Court must conduct a searching examination to discover what law the people of this state have made. Id.
I also note that Justice BRICKLEY’s dissent in Sexton, 458 Mich at 69-70 (BRICKLEY, J., dissenting), and my opinion in Bender, 452 Mich at 611-612 (opinion by CAVANAGH, J.), cited the plurality opinions in Wright. Thus, although no opinion in Wright garnered majority support, Wright provides further insight into the constitutional basis for the Bender rule.
In Wright, Justice MALLETT, joined by Justice LEVIN, explained that “[ujnder Const 1963, art 1, § 17, a criminal suspect is given the right against self-incrimination, a right similar to that provided in the Fifth Amendment of the United States Constitution.” Wright, 441 Mich at 154 (opinion by MALLETT, J.) (emphasis added). Thus, Justice MALLETT recognized that the right against self-incrimination under the Michigan Constitution is not necessarily exactly the same as the “similar” right under the federal Constitution merely because the language of the two Constitutions is nearly the same. Rather, the state right may be broader. Indeed, Justice MALLETT concluded just that when he explained that the defendant’s “confession, made without [knowledge of his attorney’s efforts to speak to him], violated the rights afforded under the Michigan Constitution.” Id. at 155 (emphasis added).
I concurred with Justice MALLETT’s conclusion that the privilege against self-incrimination under the Michigan Constitution is broader than the privilege under the United States Supreme Court’s interpretation of the Fifth Amendment. Wright, 441 Mich at 155-156 (opinion by CAVANAGH, C.J.). I provided further support for that conclusion by noting that, as far back as 1929, this Court had determined that the privilege *274 against self-incrimination under the state Constitution made it unlawful for police to deny an attorney access to his client. Id. at 157-158, citing Cavanaugh, 246 Mich 680. Finally, Justice BRICKLEY also authored a concurring opinion in Wright, emphasizing the holding in Cavanaugh in support of the conclusion that the Michigan Constitution provides a broader privilege against self-incrimination than the federal Constitution. Wright, 441 Mich at 168 (opinion by BRICKLEY, J.), citing Cavanaugh, 246 Mich 680.
Therefore, after tracing the rule prohibiting the police from denying an attorney access to a client undergoing police interrogation from Bender back to Wright, it is clear that although there has not always been majority support for a single view, the justices in support of the Bender rule rooted their analysis in the Michigan Constitution. Moreover, those justices necessarily relied on Cavanaugh (as evidenced by the Bender opinions’ citations of the Wright opinions, which cited Cavanaugh) as the primary source for the broader interpretation of the right against self-incrimination under the Michigan Constitution.[7]
By rejecting Bender on the grounds that it lacks moorings in the Michigan Constitution, the majority erroneously adopts a “literal application” of Const 1963 art 1, § 17, and “ignore[s] the jurisprudential *275 history of this Court” embodied in Cavanaugh and continued in Wright and Bender “in favor of the analysis of the United States Supreme Court. . . Sitz v Dep’t of State Police, 443 Mich 744, 758; 506 NW2d 209 (1993). In doing so, the majority “disregard[s] the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has . . . not extended such protection.” Id. at 759.
IV ADDITIONAL AND INDEPENDENT SUPPORT FOR BENDER IN THE MICHIGAN CONSTITUTION
Although I believe that art 1, § 17 of our Constitution fully supports Bender, as I explained in Wright, 441 Mich at 156-157 (opinion by CAVANAGH, C.J.), a rule prohibiting police efforts to deprive a suspect of the knowledge that his lawyer is attempting to contact him is also alternatively supported by art 1, § 20.[8] See, also, Bender, 452 Mich at 611 n 14 (opinion by CAVANAGH, J.) (citing Wright for the conclusion that “Const 1963, art 1, § 20 . . . supported suppression of the defendant’s statement”).
“There is some overlap between the privilege against self-incrimination. . . and the right to counsel;” however, “ ‘the right to counsel cases are concerned with the integrity of the adversarial process.’ ” Wright, 441 Mich at 156 n 2 (opinion by CAVANAGH, C.J.), quoting Loewy, Police-Obtained Evidence and the Constitution: Distinguishing Unconstitutionally Obtained Evidence from Unconstitutionally Used Evidence, 87 Mich L Rev 907, 928 (1989). As I stated in Wright, 441 Mich at 156 n 2 (opinion by CAVANAGH, C.J.), I believe that permitting *276 police to frustrate counsel’s efforts to communicate with a suspect “threatens the adversarial system by allowing the police to manipulate the interrogation process,” which is particularly problematic in Michigan, given that under the decision of a majority of this Court in People v Cipriano, 431 Mich 315; 429 NW2d 781 (1988), police can purposely delay a suspect’s arraignment. In my view, the majority today exacerbates the errors in Cipriano by sanctioning police efforts during that prearraignment period to obstruct a lawyer’s attempts to contact and advise his client, and to keep the suspect in the dark about the lawyer’s attempts.
Kirby v Illinois, 406 US 682, 688; 92 S Ct 1877; 32 L Ed 2d 411 (1972), established the federal limitation on when the right to counsel attaches: the right attaches “only at or after the time that adversary judicial proceedings have been initiated against him.” Kirby further stated that, as an example, the right attaches “at the time of arraignment. ...” Id. However, in Michigan, the federal limitation was at least partially rejected in People v Anderson, 389 Mich 155; 205 NW2d 461 (1973), and People v Jackson, 391 Mich 323, 338; 217 NW2d 22 (1974) (stating that “independent of any Federal constitutional mandate,. . . both before and after commencement of the judicial phase of a prosecution, a suspect is entitled to be represented by counsel at a corporeal identification or a photographic identification”).[9] Therefore, “[although Jackson and Anderson were not explicitly premised on either the Sixth Amendment or Const 1963, art 1, § 20, they support the view *277 that prearraignment events can trigger our state constitutional right to counsel.” Wright, 441 Mich at 159-160 (opinion by CAVANAGH, C.J.).
I continue to believe that Jackson’s and Anderson’s rejection of the Kirby restriction is proper because the Kirby restriction is arbitrary. Specifically, as explained in Patterson v Illinois, 487 US 285, 290 n 3; 108 S Ct 2389, 101 L Ed 2d 261 (1988), post-indictment Miranda waivers are sufficient only until an actual attorney-client relationship is established and nothing changes at the time of formal charging if there was no attorney-client relationship yet established. Thus, “[t]he converse must also hold true: If an attorney-client relationship exists before arraignment, nothing will change at the time of arraignment to cause the right to counsel to suddenly blossom where none existed before.” Wright, 441 Mich at 160 (opinion by CAVANAGH, C.J.). Accordingly, Anderson and Jackson correctly recognized that there are “critical stages” in prosecution that can occur before formal charging. I continue to believe that “custodial interrogation of an accused who is represented by counsel is just such a situation.” Id. at 160-161. Moreover, in my view, “the police can be held accountable for knowing that the accused is represented by counsel ‘to the extent that the attorney or the suspect informs the police of the representation.’ ” Id. at 161, quoting Moran, 475 US at 460 n 46 (Stevens, J., dissenting).
Accordingly, because I believe that a suspect “faced with custodial interrogation has the specific right, as part of his overall right to counsel, to be informed of his attorney’s attempts to contact him,” I would hold that “a waiver of that right cannot be valid when the police merely inform the suspect, in generalized terms, that he has the right to a lawyer if he wishes.” Wright, 441 Mich at 161 n 5 (opinion by CAVANAGH, C.J.). Simply stated, *278 “[a] defendant cannot knowingly and intelligently waive his specific right to speak with an attorney who is immediately available and trying to contact him when he is unaware that the attorney is available and trying to contact him.” Id. Instead, in my view, “the waiver can only be valid if the suspect is timely and accurately informed of his attorney’s immediate availability and attempts to contact him, and then knowingly, intelligently, and voluntarily waives the right to see the attorney.” Id.
In summary, contrary to the majority’s conclusion that Bender lacks any connection to the Michigan Constitution, our caselaw establishes that Bender is firmly rooted in art 1, § 17. Accordingly, Bender was properly decided and should not be overruled. Moreover, in my view, Bender is also supported by the right to counsel under art 1, § 20.a,
V STARE DECISIS
In light of the preceding analysis, it is clear that Bender is founded on the Michigan Constitution and is consistent with this Court’s prior precedent. Bender was correctly decided and no further stare decisis consideration is needed. However, even accepting the majority’s faulty conclusion that Bender was wrongly decided, I do not agree that its decision to overrule Bender is supported by stare decisis principles.
The United States Supreme Court has explained that the doctrine of stare decisis “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Payne v Tennessee, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). Our longstanding doctrine of stare decisis provides that “principles of law *279 deliberately examined and decided by a court of competent jurisdiction should not be lightly departed.” Brown v Manistee Co Rd Comm, 452 Mich 354, 365; 550 NW2d 215 (1996) (quotation marks and citations omitted), overruled in part on other grounds by Rowland v Washtenaw Co Rd Comm, 477 Mich 197; 731 NW2d 41 (2007). As a result, “a stare decisis analysis should always begin with the presumption that upholding the precedent involved is the preferred course of action.” Petersen v Magna Corp, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.). Thus, “overturning precedent requires more than a mere belief that a case was wrongly decided,” McCormick v Carrier, 487 Mich 180, 211; 795 NW2d 517 (2010), and the presumption in favor of upholding precedent “should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn the precedent.” Petersen, 484 Mich at 317 (opinion by Marilyn Kelly, C.J.).
Moreover, when our caselaw concludes that the Michigan Constitution provides greater protection to our citizens than that provided by the federal Constitution, I believe “this Court should be required to show a compelling reason to depart from [that] past precedent.” Goldston, 470 Mich at 559 (CAVANAGH, J., dissenting), citing People v Collins, 438 Mich 8, 50; 475 NW2d 684 (1991) (CAVANAGH, C.J., dissenting).
Several of the criteria discussed in Petersen[10] weigh in favor of upholding Bender rather than overruling *280 it: (1) Bender provides a practical and workable rule; (2) facts and circumstances have not changed, or come to be seen so differently, as to have robbed Bender of significant application or justification; (3) other jurisdictions have adopted rules similar to Bender that are more protective of the privilege against self-incrimination than the federal rule; and (4) overruling Bender is likely to result in serious detriment prejudicial to public interests. See Petersen, 484 Mich at 320 (opinion by MARILYN KELLY, C.J.).
Bender’s per se rule prohibiting police interference with counsel’s efforts to communicate with a suspect is easily understood by the police and creates little, if any, uncertainty regarding what is required: the police must inform a suspect that counsel has been retained for him and is attempting to contact him. Bender, 452 Mich at 620 (opinion by CAVANAGH, J.). See, also, Wright, 441 Mich at 163-164 (opinion by CAVANAGH, C.J.) (stating that “if an attorney takes diligent steps to inform the police that he represents and wishes to contact a suspect held in custody, the police must take prompt and diligent steps to inform the suspect of that fact”). Accordingly, as even the majority admits, Bender provides a practical and workable rule. See ante at 253. This factor therefore weighs heavily in favor of upholding Bender.
Nevertheless, the majority inexplicably applies an approach that merely pays lip service to the obvious practical workability of Bender while primarily considering whether a regime other than the Bender rule might be equally workable. A stare decisis analysis focuses on the established rule’s workability; not whether some other rule may or may not be applied as easily as the established rule. See Petersen, 484 Mich at 320 (opinion of MARILYN KELLY, C.J.) (considering *281 “whether the rule has proven to be intolerable because it defies practical workability”) (emphasis added); and Robinson, 462 Mich at 464 (considering “whether the decision at issue [i.e., the established rule] defies ‘practical workability’ ”) (emphasis added). That focus on the established rule is consistent with the understanding that upholding the precedent involved is “the preferred course, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Hohn v United States, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998) (citation and quotation marks omitted). See, also, Petersen, 484 Mich at 317 (opinion by MARILYN KELLY, C.J.). The majority’s faulty stare decisis analysis features its attempt to manipulate this factor with an approach that lacks any support in caselaw and all but ignores the practical workability of the existing rule.
Further supporting the conclusion that Bender should not be overruled is the fact that circumstances have not come to be seen so differently as to have robbed Bender of significant justification. Indeed, protection of a citizen’s constitutional rights within the custodial-interrogation setting remains as important today as it was when Bender was decided 18 years ago, as evidenced by this Court’s and the United States Supreme Court’s repeated consideration of the issue.
Moreover, many states have, as Michigan did in Bender, recognized that Moran merely establishes a minimum requirement and have determined that their citizens enjoy greater state constitutional protection than afforded by Moran.[11] As a result, Bender is far *282 from unique in concluding that state law provides greater constitutional protections than the federal Constitution regarding the privilege against self-incrimination. Although I recognize that some states have adopted Moran as consistent with the protections provided by their state Constitutions, the fact that the states are divided on the issue at most renders this factor neutral.
Finally, in my view, the most significant factor in favor of upholding Bender is that the majority’s contrary decision is likely to result in serious detriment prejudicial to public interests. The majority disagrees, claiming that “[i]t is hard to comprehend a societal interest that is furthered by protecting persons who have engaged in serious criminal activities from the consequences of their own voluntary and intelligent decisions.” Ante at 255. To begin with, this statement entirely ignores the overriding principle of our criminal justice system: that a suspect is presumed innocent until proven guilty beyond a reasonable doubt. Thus, whether there is a “societal interest” in protecting any particular conduct of a person who has “engaged in serious criminal activities” is entirely irrelevant. However, in my view, the “societal interest” in *283 protecting the ability of those merely accused of a crime to make a truly “knowing and intelligent” waiver of their constitutional rights is of the highest order. Moreover, “if law enforcement officers adhere to [Bender], there will be no reversal of convictions on the basis of failure by officers to inform the suspect that his counsel wished to speak with him before he made a confession.” Bender, 452 Mich at 597 n 1 (opinion by CAVANAGH, J.). Therefore, if a Bender violation occurs, “it will be a government agent, and not this Court, that is responsible for thwarting and hampering cases of urgent social concern....” Id.
Moreover, I disagree with the majority’s subjective and unsupported conclusion that Bender “impinge[s] on the effectiveness of law enforcement....” Ante at 254. For starters, it does not appear that Michigan’s law enforcement has suffered from a serious inability to effectively enforce the law in the 18 years since Bender was decided.[12] Apparently, the many other states that have declined to follow Moran have likewise managed to avoid becoming lawless wastelands of crime, despite the majority’s concern. See, also, Moran, 475 US at 460 (Stevens, J., dissenting) (stating that an argument similar to the majority’s “is not supported by any reference to the experience in the states that have adopted” a rule similar to Bender), and Goldston, 470 Mich at 568-569 (CAVANAGH, J., dissenting) (considering the similar concern of the majority in that case “that the high cost of the exclusionaiy rule exacts too *284 great a toll on our justice system” and noting that “our state has managed to exist for decades with the exclusionary rule and our streets have yet to become teeming with criminals”).
Although I think that the majority’s concern that Bender unduly interferes with law enforcement is exaggerated, I am nevertheless aware that the Bender rule “may decrease the likelihood that interrogating officers will secure a confession.” Bender, 452 Mich at 618 (opinion by CAVANAGH, J.). However, that cost must be balanced against the result of the majority’s favored rule. “[PJolice deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation. . . .” Moran, 475 US at 452 (Stevens, J., dissenting). Accordingly, while confessions “are not only a valid, but also an essential part of law enforcement,” Bender, 452 Mich at 597 n 1 (opinion by CAVANAGH, J.), “ ‘[t]he quality of a nation’s civilization can be largely measured by the methods it uses in the enforcement of its criminal law.’ ” Miranda, 384 US at 480, quoting Schaefer, Federalism and State Criminal Procedure, 70 Harv L Rev 1, 26 (1956).
No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, [his rights to remain silent and to counsel]. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system. [Escobedo v Illinois, 378 US 478, 490; 84 S Ct 1758; 12 L Ed 2d 977 (1964).]
VI. CONCLUSION
Bender has stood undisturbed for nearly 20 years and has foundations as far back as 1929. See Ca *285 vanaugh, 246 Mich 680. Moreover, Bender correctly determined that art 1, § 17 of the Michigan Constitution provides Michigan’s citizens greater protection than its federal counterpart. That conclusion, in my view, is further supported by the Court’s interpretation of art 1, § 20 of our Constitution. Finally, the doctrine of stare decisis weighs against overruling Bender. Accordingly, I dissent.

 This Court also reached the same conclusion in an earlier plurality opinion. See People v Wright, 441 Mich 140; 490 NW2d 351 (1992).

 Const 1963, art 1, § 17 states, in relevant part, “[n]o person shall he compelled in any criminal case to be a witness against himself....”

 US Const, Am V, states in part that “[n]o person shall... be compelled in any criminal case to be a witness against himself. ...”

 I recognize that the majority acknowledges that “Miranda has established an irreducible minimum standard for purposes of all custodial interrogations in Michigan,” ante at 226 n 19, and thus agrees that a confession may also be inadmissible if a suspect’s waiver of rights is not made voluntarily, knowingly, and intelligently. However, by arguing that only “involuntary confessions” are prohibited under the Michigan Constitution and that the other limitations are only the product of Miranda’s *260 interpretation of the federal Constitution, the majority erroneously concludes that our state courts never adopted a broader interpretation of the Michigan Constitution pr e-Miranda, as will be explained later in this opinion.

 The fact that defense counsel did not adopt this view at oral argument is of no moment: “this Court is not bound by the [parties’] interpretation of the case and may consider and analyze the facts and issues independent of such concession.” Camaj v S S Kresge Co, 426 Mich 281, 290 n 6; 393 NW2d 875 (1986), citing Sibron v New York, 392 US 40, 58-59; 88 S Ct 1889; 20 L Ed 2d 917 (1968).

 The majority cites Ire re Moser, 138 Mich 302; 101 NW 588 (1904), and Paramount Pictures Corp v Miskinis, 418 Mich 708; 344 NW2d 788 (1984), in support of its conclusion that the Michigan Constitution has not been interpreted to provide more protection regarding self-incrimination than the federal Constitution. However, Moser pre-dates Cavanaugh. Because Cavanaugh granted the protection under the state Constitution, and the framers of the 1963 Michigan Constitution are presumed to have been aware of Cavanaugh, I do not believe that Moser supports the majority’s conclusion. Regarding Paramount Pictures, that opinion did not cite Cavanaugh and thus provides no insight regarding Cavanaugh’s impact on our pre-Miranda interpretation of the Michigan Constitution.

 The majority rejects this conclusion, positing that “this Court did not rely on Cavanaugh for the proposition that the compulsory self-incrimination provision contained in Article 1, § 17 provides protections that extend beyond those afforded by the Fifth Amendment.” However, in the same breath, the majority concedes that my opinion in Wright cited Cavanaugh for the premise that a violation of the protections that are now contained in art 1, § 17 occurs when the police conceal from a suspect that counsel has been made available to him. See Wright, 441 Mich at 157-158 (opinion by Cavanagh, C.J.). Moreover, Bender cited Wright for support. See, e.g., Bender, 452 Mich at 611-612 (opinion by Cavanagh, J.). Accordingly, the majority is misguided in its interpretation of Cavanaugh’s effect on the analysis in Wright and Bender.

 Const 1963, art 1, § 20 states, in relevant part, “[i]n every criminal prosecution, the accused shall have the right to ... have the assistance of counsel for his or her defense . . ..”

 I recognize that, in People v Hickman, 470 Mich 602; 684 NW2d 267 (2004), a majority of this Court overruled Anderson and its progeny, including Jackson. However, I continue to believe that this Court erred when it overruled Anderson for the reasons stated in Justice Marilyn Kelly’s dissent in Hickman. Id. at 611-621 (Marilyn Kelly, J., dissenting).

 In Petersen, Chief Justice Marilyn Kelly provided a nonexhaustive list of criteria for consideration when a court engages in a stare decisis analysis, hut no single criterion is determinative, and a given criterion need only he evaluated if relevant. Petersen, 484 Mich at 320 (opinion hy Marilyn Kelly, C.J.). By expanding on the test from Robinson v Detroit, 462 Mich 439, 464; 613 NW2d 307 (2000), which the majority applies, Petersen’s test is also more respectful of precedent than Robinson.

 See, e.g., Stoddard, 206 Conn at 164-167 (declining to follow Moran based on state precedent interpreting the state constitution); Bryan v *282 State, 571 A2d 170, 176-177 (Del, 1990) (same); Commonwealth v Mavredakis, 430 Mass 848, 858-860; 725 NE2d 169 (2000) (same); State v Roache, 148 NH 45, 49-51; 803 A2d 572 (2002) (same); People v McCauley, 163 Ill 2d 414, 423-425; 206 Ill Dec 671; 645 NE2d 923 (1994) (same); State v Simonsen, 319 Or 510, 514-518; 878 P2d 409 (1994) (same); Roeder v State, 768 SW2d 745, 753-754 (Tex App Ct, 1988) (same); Reed, 133 NJ at 250 (declining to follow Moran in light of state statutory and common law); Haliburton v State, 514 So 2d 1088, 1090 (Fla, 1987) (declining to follow Moran and finding a violation of the Due Process Clause of the Florida Constitution); and West v Commonwealth, 887 SW2d 338, 342-343 (Ky, 1994) (declining to follow Moran because the Kentucky Constitution provides greater protection than the federal Constitution and a state criminal rule providing access to counsel predating Aforara remained applicable). See, also, Reed, 133 NJ at 265 (noting that “[p]rior to Moran, a majority of states followed a rule similar to” Bender).

 The majority disagrees, arguing, “the negative effects of Bender are not obviously seen....” Ante at 255 n 39. In my view, Bender protects our citizen’s constitutional rights; accordingly, I cannot agree with the majority’s conclusion that Bender’s effects are “negative.” Likewise, the majority’s recitation of the prosecution’s protestations against Bender could apply with equal force to other constitutional protections afforded to criminal suspects. Nevertheless, we uphold these constitutional protections. We should do the same with Bender because the goal is justice through proper application of constitutional principles, not convictions at any cost.